IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| BOAZ PLEASANT-BEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 2:11cv-02138-TLP-tmp |
| v. | ) |
| | ) |
| MARK H. LUTTRELL, JR., Shelby County | ) |
| Mayor, WILLIAM OLDHAM, Shelby | ) |
| County Sherriff, COMMANDER | ) |
| RODGERS, CHAPLAIN HAWKINS, | ) |
| CHIEF COLEMAN, CHIEF MOORE, | ) |
| CHIEF BOWERS, CHIEF MCGHEE, and | ) |
| SHELBY COUNTY, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Both parties here have moved for Summary Judgment. (ECF Nos. 54, 59.)[1] For the reasons noted below, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.

**BACKGROUND**

When Plaintiff filed his Complaint, he was a prisoner at Shelby County Jail (the "Jail"). (ECF No. 1 at PageID 1.) His Complaint stems from his Islamic faith and the alleged discrimination that he endured because of it. His Complaint appears to stem from two

---

[1] Technically, Defendants' Motion requests dismissal, or in the alternative, summary judgment. (ECF No. 54 at PageID 1.) But the Court refers to it as one for summary judgment because that is what relief the Court grants.

grievances that he filed with Defendants in November and December 2010—numbers 295356 and 296144. (*Id*. at PageID 1, 8–9.)

Plaintiff's Complaint asserts ten allegations stemming from these grievances:

- Defendants employed two Christian chaplains but employed no Muslim imam. (*Id*. PageID 8.)
- Defendants gave Christians continuous access to chaplains but did not give Muslims similar access to imams. (*Id*.)
- Defendants refused to allow Plaintiff to serve as an imam for prison services—termed Jumu'ah services. (*Id*.)
- Defendants limited the number of inmates that could attend Jumu'ah services. (*Id*.)
- Defendants' Gang Investigation Unit ("GIU") monitored Jumu'ah services but did not monitor Christian services. (*Id*.)
- Defendants' policies failed to allow for proper Jumu'ah services. (*Id*.)
- Defendants failed to provide proper meal service during Ramadan. (*Id*.)
- Defendants failed to provide a feast at the end of Ramadan. (*Id*.)
- Defendants' GIU categorized all Muslim inmates as gang members. (*Id*. at PageID 9.)
- Defendants went four months without providing a Jumu'ah service. (*Id*.)

Plaintiff argues that the above ten allegations violated his rights under the Religious Freedom Restoration Act ("RFRA"), the Civil Rights of Institutionalized Persons Act ("CRIPA"), the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the First Amendment, the Fourteenth Amendment, and § 1983. (*Id*. at PageID 1.) As a result, he requests the start of this action, a preliminary injunction, $1 million in compensatory damages per Defendant, and costs. (*Id*. at PageID 7.)

Earlier in this case, the Court dismissed portions of Plaintiff's claims. (ECF Nos. 9, 37.) On appeal, the Sixth Circuit Court of Appeals reversed portions of the Court's prior rulings, it also affirmed the Court's dismissal of Plaintiff's injunctive requests, claims against Defendants Luttrell and Oldham, and § 1983 claims before February 15, 2010. (ECF No. 49 at PageID 472–73); (ECF No. 9 at PageID 73–75); (ECF No. 37 at PageID 433.)

## **STANDARD OF REVIEW**

"[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "establish[es] or refute[s] an essential element of the cause of action or defense." *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 776 (6th Cir. 2012) (internal quotation marks omitted).[2] A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

"The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." *Mosholder v. Barnhardt*, 679 F.3d 443, 448 (6th Cir. 2012) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Id.* at 448–49 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof,

---

[2] Each party must cite "particular parts of materials in the record" or show that the other party's cited materials do not establish the presence or absence of a genuine factual dispute. Fed. R. Civ. P. 56(c)(1); *see also Bruederle*, 687 F.3d at 776. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Pharos Capital Partners, L.P. v. Deloitte & Touche*, 535 F. App'x 522, 523 (6th Cir. 2013) (per curiam) (quoting *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008), *abrogation recognized by Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015)).

the moving parties are entitled to judgment as a matter of law and summary judgment is proper." *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (citing *Celotex Corp.*, 477 U.S. at 323).

## **ANALYSIS**

This action concerns both substantive and procedural disputes, both of which the Court should address on its path towards resolving the Motions for Summary Judgment. As for procedure, the question is whether Plaintiff exhausted his administrative remedies under the Jail's Grievance Procedures. As for substance, the question is whether Defendants violated Plaintiff's rights under RFRA, CRIPA, RLUIPA, the First Amendment, the Fourteenth Amendment, or § 1983.

**I.     Plaintiff Properly Exhausted His Administrative Remedies Under the Jail's Grievance Procedures.**

A prisoner must exhaust her administrative remedies with the prison itself before filing an action in federal court. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The purpose for this is twofold—it gives the prison an opportunity to correct a potential mistake before subjecting it to suit and it promotes efficiency by resolving claims internally rather than brining disputes to court at the outset. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (citing *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)) *superseded by statute*.

Ultimately, "the prison's requirements . . . define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). In other words, "an inmate exhausts a claim by taking advantage of each step the prison holds out for resolving the claim internally

and by following the critical procedural rules of the prison's grievance process." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (quotations omitted). That said, exhaustion is an affirmative defense—the burden of proving Plaintiff's failure to exhaust rests on Defendants. *See Mattox v. Edelman*, 851 F.3d 683, 590 (6th Cir. 2017).

Here, Defendants argue that Plaintiff did not exhaust his administrative remedies because he (1) failed to identify persons in his grievances that he later named in this action, (2) failed to timely file his grievances, and (3) failed to follow the prison's policy on the number of grievances that an inmate can file within a given time period.

As for party identification, Defendants are correct that Plaintiff names parties here that he did not name in grievances 295356 or 296144—specifically Defendants Bowers, McGhee, Coleman, and Rodgers. (ECF No. 24 at PageID 188); (ECF No. 54 at PageID 495.) But the Jail's Grievance Procedures do not explicitly require an inmate to name all relevant personnel when filing a grievance. (ECF No. 58-1 at PageID 547.) Only the grievance forms discuss the naming of personnel. (ECF No. 1 at PageID 8.) To note, a form is very different from a procedure, and it is the *procedures* that the Court concerns itself with. *See Jones*, 549 U.S. at 218 ("[I]t is the prison's requirements . . . that define the boundaries of proper exhaustion."). As a result, Defendants' identification argument is unconvincing.

As for timeliness, Defendants argue that the grievances 295356 and 296144 fall outside the applicable filing window. (ECF No. 58 at PageID 535.) The Grievance Procedures require inmates to file line grievances within thirty days of their occurrence. (ECF No. 58-1 at PageID 547.) Here, 295356 and 296144 allege violations "[f]rom 2007–Oct. 2010 present." (ECF No. 1 at PageID 8.) So at first glance, they appear to fall outside the filing window. (*Id.*) But importantly, Defendants rejected these grievances for being over the limit,

5

not on their timing. (ECF No. 66 at PageID 676.) In doing so, they waived their timeliness argument. *See Maxwell v. Corr. Med. Serv., Inc.*, 538 F. App'x 682, 689–90 (6th Cir. 2013) (treating untimely grievances as timely because prison officials addressed the grievances on the merits rather than rejecting the grievance for being untimely). As a result, Defendants' timeliness argument is unconvincing.

As for excessive filing, Defendants argue that 295356 and 296144 violated the Grievance Procedures because they were "over the limit." (ECF No. 58 at PageID 533–34.) According to the Grievance Procedures, prisoners may not file more than five grievances within a thirty-day period. (ECF No. 58-1 at PageID 547.) If they do, they may file only two additional grievances within the next six months. (*Id.*) Defendants will reject any grievances over this amount as "over the limit." (*Id.*)

The Procedures are somewhat vague about how the filing window - "one month" or "thirty (30) day[s]"—applies because the Procedures use each term at different parts of the applicable section. Yet the answer is not material. What is material, on the other hand, is whether Plaintiff "t[ook] advantage of each step the prison holds out for resolving the claim internally" and "follow[ed] the critical procedural rules of the prison's grievance process." *Reed-Bey*, 603 F.3d at 324 (quotations omitted).

Plaintiff filed six grievances between August 11, 2010 and September 6, 2010. (ECF No. 58-1 at PageID 552–56; ECF No. 58-2 at PageID 557.) Thus, Plaintiff could only file two additional grievances in the next six months. He filed eight grievances during that time so that is what resulted in 295356 and 296144 being rejected as "over the limit." (ECF No. 58 at PageID 533–35.)

Defendant argues that denial for being over the limit evidences a failure to exhaust. (*Id*.) But the Court disagrees. Being denied as over the limit evidences exhaustion because once Defendants categorized 295356 and 296144 as being over the limit, he had no recourse. He thus took advantage of each step that the Jail offered for resolving the claims that he had in 295356 and 296144. *See Reed-Bey*, 603 F.3d at 324 (quotations omitted). As a result, Defendants' excessiveness argument is unconvincing.

## II. Plaintiff's CRIPA Claim Fails as a Matter of Law.

CRIPA authorizes the U.S. Attorney General to sue a state when it subjects institutionalized persons "to egregious or flagrant conditions which deprive such persons of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . ." 42 U.S.C. § 1997a. But there is no private right of action under CRIPA. *See Rudd v. Polsner*, 229 F.3d 1153 (Table) (6th Cir. 2000). As a result, the Court DISMISSES Plaintiff's CRIPA claim.

## III. Plaintiff's RFRA Claim Fails as a Matter of Law.

RFRA prohibits governmental burdens on individuals' religious practices unless that burden (1) furthers a compelling state interest and (2) is the least restrictive means of doing so. *See* 42 U.S.C. § 2000bb-1. In doing so, RFRA essentially reinstates the balancing test from *Sherbert v. Verner*. *See Holt v. Hobbs*, 135 S. Ct. 853, 859–60 (2015); *see also Sherbert v. Verner*, 374 U.S. 398, 403–06 (1963), *overruled in Employment Div. v. Smith*, 494 U.S. 872, 877–78, 884–85 (1990), *superseded by statute*, Religious Freedom Restoration Act of 1993. "Under the *Sherbert* test, governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest." *Employment Div.*, 494 U.S. at 883.

7

But RFRA applies only to the federal government. *See City of Boerne v. Flores*, 521 U.S. 507, 532–36 (1997); *Dotson v. Shelby Cty.*, No. 13-2766-JDT-TMP, 2014 WL 3530820, at *9 (W.D. Tenn. July 15, 2014). Because Plaintiff brings his RFRA claims against nonfederal parties, the Court therefore DISMISSES Plaintiff's RFRA claim.

## IV. Plaintiff's RLUIPA Claim Fails as a Matter of Law.

Like RFRA, RLUIPA applies strict scrutiny to governmental burdens on religious exercise. *See* 42 U.S.C. § 2000cc–5. But RLUIPA's application extends to state and local governments that receive federal funds. *Holt*, 135 S. Ct. at 860; *Haight v. Thompson*, 763 F.3d 554, 559–60 (6th Cir. 2014). At its core, the statute "allows inmates to seek 'appropriate relief' from a 'government' for RLUIPA violations." *Haight*, 763 F.3d at 568 (quoting § 2000cc–2(a)).[3]

Although RLUIPA conceptually applies to this action, the Court notes that an inmate's right to "appropriate relief" does not encompass monetary damages.[4] *See id*. at 568–70 (holding that the phrase "appropriate relief" entitles no claimant to monetary damages under the clear-statement rule). Thus, because Plaintiff's prayer for injunctive relief has been denied, he may receive only monetary damages at this stage of the action. (ECF No. 9 at

---

[3] "[G]overnment" is defined as: "(i) a State, county, municipality, or other governmental entity created under authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law." § 2000cc–5(4)(A).

[4] "Congress must speak with clarity . . . before it imposes money-damages remedies against the States under its spending powers." *Haight*, 763 F.3d at 568 (citing *Sossamon v. Texas*, 563 U.S. 277, 289–91 (2011)). "'Far from clearly identifying money damages . . . the word 'appropriate' is inherently context-dependent' and thus does not apply to money-damages claims." *Id*. (quoting *Sossamon*, 563 U.S. at 286). "Because the imperative of clarity applies in all of these settings and because *Sossamon* establishes that the phrase "appropriate relief" [under RLUIPA] does not clearly entitle a claimant to money damages, the claimants' request for money damages must fail." *Id*. at 569.

PageID 74–75.) Because Plaintiff is not eligible for such damages, the Court DISMISSES his RLUIPA claim.

## V. Plaintiff's § 1983 Claim Does Not Survive Summary Judgment.

Section 1983 creates a "species of tort liability" when state officials violate a person's constitutional rights. *See* § 1983; *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017); *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976). Plaintiff alleges that Defendants violated his First and Fourteenth Amendment rights. (ECF No. 1 at PageID 1.)[5] The Court takes each allegation in turn.

### A. Defendants Did Not Violate Plaintiff's First Amendment Rights.

#### 1. *Hayes v. Tennessee* Guides the Court's First Amendment Analysis.

Plaintiff alleges a First Amendment violation under the Free Exercise Clause. (ECF No. 59 at PageID 569–78.) The Free Exercise Clause prohibits governmental burdens on a person's free exercise of religion. *See* U.S. Const. amend. I. Though prisoners retain their First Amendment rights during incarceration, "the circumstances of prison life may require some restrictions on prisoners' exercise of their religious beliefs." *Hayes v. Tennessee*, 424 F. App'x 546, 549 (6th Cir. 2011). As a result, "[w]hen a prison regulation substantially infringes on an inmate's First Amendment religious practices, 'the regulation is valid if it is reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

---

[5] Plaintiff's Motion for Summary Judgment also alleges violations of his Eighth Amendment and First Amendment rights, with his First Amendment claim falling under the Establishment Clause. But Plaintiff's Amended Complaint fails to assert these claims and the Court has denied Plaintiff's further requests to amend. Thus, the Court will not consider these improperly asserted violations.

9

"Maintaining security, order, and discipline are essential goals of a corrections system, prison officials are accorded wide latitude in the adoption and application of prison policies and procedures." *Id.*; *see Bell v. Wolfish*, 441 U.S. 520, 546–47 (1979). "[B]ecause 'the problems of prisons in America are complex and intractable,' and because courts are particularly 'ill equipped' to deal with these problems, [courts] generally have deferred to the judgments of prison officials in upholding these regulations against constitutional challenge." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (quoting *Procunier v. Martinez*, 416 U.S. 396, 404–05 (1974)) (internal citation omitted).

*Hayes* suggests four factors when reviewing prison regulations for potential religious burdens—(1) is there a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2), are there "alternative means of exercising the right that remain open to prison inmates," (3) what is " the impact that the asserted constitutional right will have on the rights of prison guards and other inmates, as well as the allocation of prison resources," and (4) is there an "absence of ready alternatives [to evidence] the reasonableness of a prison regulation." *Id*. at 549–50 (internal quotations omitted).

Perhaps, Plaintiff's ten allegations all raise Free-Exercise issues. These claims then group together around challenges to particular aspects of the Jail's regulations and practices.

### 2. Defendants' Limitations on Jumu'ah Services Did Not Violate the Free Exercise Clause.

Plaintiff attacks the frequency and character of the Jail's Jumu'ah services. He alleges that Defendants (1) refused to allow Plaintiff to serve as an imam for Jumu'ah services, (2) limited the number of inmates that could attend a Jumu'ah service, (3) monitored Jumu'ah services through the GIU but did not monitor Christian services, (4) categorized all Muslims

10

as gang members, (5) failed to conduct proper Jumu'ah services, and (6) went four months without providing a Jumu'ah service. (ECF No. 1 at PageID 8–9.) And he alleges Defendants converted proper Muslim Jumu'ah services to "Jumu'ah Prayer Only Services," which Plaintiff asserts does not exist in Islam. (ECF No. 59 at PageID 568.)

Over the course of litigating this action, Plaintiff submitted affidavits of other inmates at the Jail. (ECF No. 28-4 at PageID 296–300.) These affidavits evidenced that Defendants limited Jumu'ah services to nine inmates at a time for a maximum of ten minutes per service. (*Id*.) These inmates also asserted that Christian services were much longer and larger. (*Id*.) Finally, they asserted that the GIU attended only Muslim services, not Christian ones. (*Id*.)

Defendants argue that their Jumu'ah-related policies stem from security concerns. (ECF No. 64 at PageID 665–66.) They argue that the Jail's policies prohibit inmates from being put in positions of authority over other inmates for group services. (*Id*.); (ECF No. 24-1 at PageID 205.) So they rejected allowing plaintiff or another inmate to serve the other inmates as an imam. They argue that Plaintiff was located on the Jail's fourth floor—the maximum-security floor. (*Id*. at PageID 665.) As a result, they assert that GIU monitoring, and limiting the maximum number of inmate attendance, "is reasonably related to and necessitated by the legitimate interests of the [the Jail] in operating . . . [in] a secure, orderly and disciplined manner." (*Id*. at PageID 666.)

Furthermore, like Plaintiff, Defendants submitted affidavits in this action. (ECF No. 24-2–24-6.) For example, Defendant Moore's affidavit states that:

> There are greater restrictions place on inmates housed on the 4th Floor and 1st Floor C-Pod for security reasons. . . .
> 4th Floor inmates attend religious services in a room that holds approximately 20 inmates and all services are restricted to that approximate number of inmates. All religious services on that floor are allotted approximately one hour.

11

> On the 4th Floor, officers assigned to the [GIU] provide security for [Jumu'ah] services. GIU members do not interfere with religious services but if inmates are committing institutional violations, they will intervene.
> [Jumu'ah] services conducted by the volunteer Imam last approximately 45 minutes to one hour. If the Imam is unable to attend, the inmates join in communal prayer for as long as they wish, usually less than 20 minutes.

(ECF No. 24-1 at PageID 198–99.)

Here Defendants put forth a legitimate governmental justification for imposing limitations on the number of inmates who can attend Jumu'ah services. Prison security is certainly a legitimate governmental interest. *See Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (stating that prison security is, in fact, a "compelling state interest"). Furthermore, prohibiting inmate-led religious groups "clearly has a valid, rational connection to [the Jail's] interest in maintaining prison security." *Spies v. Voinovich*, 173 F.3d 398, 405–06 (6th Cir. 1999) (upholding a prison regulation that prohibited inmate-led groups).

What is more, limiting the attendance and duration of Jumu'ah services, as well as monitoring them, is not a facially invalid security decision. The Plaintiff himself acknowledged that gang members attend Jumu'ah services. (ECF No. 1 at PageID 4.) The Court finds that Defendants could well seek to limit 4th floor gang members from meeting for extended periods.

Plaintiff has alternative means to exercise his religious rights, either through Jumu'ah services guided by volunteer imams, or when imams are unavailable, through Jumu'ah prayer-only services. (ECF No. 24-1 at PageID 198–99.) Of course, Plaintiff argues that Jumu'ah prayer-only services are improper Islamic ceremonies. But *Hayes* does not require perfect adherence to an inmate's religious preferences. *See Hayes*, 424 F. App'x at 549–50. Instead,

*Hayes* requires limitations justified by legitimate governmental interest that are rationally related to the limitation imposed. *See id*.

More important, Plaintiff does not put forward ready alternative means for the Jail to enforce its legitimate security concerns. Plaintiff also fails to consider the cost that potential alternatives may impose on the allocation of prison resources. *See Hayes*, 424 F. App'x at 549–50. The Court is thus left to review potential alternatives on its own, and it defers to Defendants' judgments and upholds them against constitutional challenges. *See id*. at 550; *Shaw*, 532 U.S. at 229. As a result, the Court finds that Plaintiff's Jumu'ah-related allegations, taken as true, did not violate Plaintiff's First Amendment rights.

### 3. Defendants' Food-Service Policies Did Not Violate the Free Exercise Clause.

Plaintiff attacks Defendants' food policies as they relate to Ramadan. He alleges that (1) Defendants failed to provide Plaintiff proper meal service during Ramadan and (2) Defendants did not provide inmates a feast at Ramadan's conclusion despite providing feasts on Christian holidays. (ECF No. 59 at PageID 568.)

"[P]rison administrators must provide an adequate diet without violating [an] inmate's religious dietary restrictions." *Colvin v. Caruso*, 605 F.3d 282, 290 (6th Cir. 2010). But there is not one definition of nutrition in the First Amendment context. *See Welch v. Spaulding*, 627 F. App'x 479, 487 (6th Cir. 2015). After all, nutrition is a multi-factored concept. *See id*.

Here, Plaintiff concedes that Defendants altered their food service to accommodate Ramadan.[6] (ECF No. 59-2 at PageID 585–86.) Yet he challenges the amount of food that

---

[6] During Ramadan, practicing Muslims fast during day-light hours. Ramadan lasts one month, during the ninth month of the Arabic lunar calendar. Bryant Rousseau, *Ramadan is Here. What Islam's Holiest Month is About.*, N.Y. TIMES (June 5, 2016), https://www.nytimes.com/2016/06/06/world/middleeast/islam-ramadan-2016.html.

13

Defendants provided him during his pre-sunrise and post-sunset meals. (*Id.*) He asserts that his two meals were "so small that they were noticeably half the size of the normal meals fed to the general population. I lost about 10 pounds of weight during the Ramadan fast of 2010 because of the little portions of food served." (*Id.* at PageID 585.) This, he argues, made it difficult for him to continue fasting during Ramadan. (*Id.*) He also asserts that it is "traditional for Muslims to break their fast with dates, [and] dates were never made available for the purposes of breaking the Ramadan fast each day after sunset." (*Id.*)

Defendants, for their part, assert that "[a] nutritionist approves all inmate meals." (ECF No. 24-2 at PageID 208); (ECF No. 24-3 at PageID 214); (ECF No. 24-4 at PageID 220); (ECF No. 24-5 at PageID 227); (ECF No. 24-6 at PageID 232.) And perhaps fatally, Plaintiff does not respond to this particular assertion, which, for summary-judgment purposes, the Court treats as admitted. *See Chapman*, 670 F.3d at 680. The question, then, for the Court is whether losing 10 pounds or receiving small portions creates a genuine issue of material fact.

Though the Court finds that depriving Plaintiff of an adequate diet through his pre-dawn and post-dusk meals during Ramadan *would* violate Plaintiff's First Amendment rights, it does not find that Defendants *did* deprive Plaintiff. Plaintiff asserts that his portions were improperly small and that he lost ten pounds as a result. (ECF No. 59-2 at PageID 585–86.) But what evidence is there to bolster this conclusion?

This action is seven-years old, and yet the record lacks exactly how small Plaintiff's Ramadan meals allegedly were. What did Plaintiff eat? Did he receive a piece of bread and an orange? Did he receive buttered grits? The size of the meals does not always reflect its nutritional density.

And Plaintiff asserts that he lost ten pounds during Ramadan. (*Id*. at PageID 585.) But Ramadan is a period of fasting—it makes complete sense that eating less often, and at unusual times, would lead to weight loss. This does not mean that his diet was not nutritious, or that he failed to regain his weight after Ramadan. *See Alexander v. Carrick*, 31 F. App'x 176, 179 (6th Cir. 2002); *Welch*, 627 F. App'x at 485 (McKeague, J., dissenting) (arguing that "[r]eceiving half the calories as other prisoners during a fast is thus not constitutionally inadequate unless the prisoner can show—by sufficient evidence at the summary-judgment stage—that he 'would have been malnourished' . . . if he didn't give up his fast.").

Lastly, as for Plaintiff's assertion that Defendants did not provide him with dates during Ramadan, the Court does not give this allegation credence. The First Amendment does not give inmates a right to the diet of their choosing. *See Robinson v. Jackson*, 615 F. App'x 310, 313 (6th Cir. 2015).

Plaintiff argues that Defendants should have provided him a feast day at the end of Ramadan. The Court is unconvinced. Defendants assert that they do not have the funds to provide a feast after Ramadan. (ECF No. 24-2 at PageID 210); (ECF No. 24-3 at PageID 216); (ECF No. 24-4 at PageID 223); (ECF No. 24-6 at PageID 234.) The Court gives Defendants deference on this point. *See Hayes*, 424 F. App'x at 551. Prisons operate on budgets and they have a legitimate interest in allocating their funds in ways to support their penological mission. Choosing to not provide a post-Ramadan feast and instead allocate funds to other areas is a permissible exercise of the Defendants' discretion to allot funds to achieve the valid penological goals of the correctional institution. This is especially so given that Defendants likely expended considerable resources to adjust the delivery of meals during the month of Ramadan.

Plaintiff asserts that Defendants' providing of three feast days for Christian holidays evidences a discriminatory justification for denying a feast after Ramadan. (ECF No. 59 at PageID 573.) But again, Defendants rearranged their meal service for an entire month during Ramadan. Although Ramadan is not a feast day, per se, it is a religious observance that Defendants accommodated for an extended period. And there is no equivalent month of fasting for Christians during which Defendants would need to divert resources to rearranging meal service. Thus, Plaintiff does not provide the Court with ready alternatives with which Defendants could accomplish their legitimate interest of conserving funds. *See id*. So the Court thus declines to wade into the role of a jail administrator and determine how the correctional institution should allocate its limited resources to provide meal services beyond what the constitution requires.

As a result, the Court finds that the alleged food-service policies did not violate Plaintiff's First Amendment rights.

### 4. Defendants' Policy Concerning Hiring an Imam Did Not Violate the Free Exercise Clause.

Plaintiff attacks his access to an imam, alleging that (1) Defendants refused to hire an imam, despite employing two chaplains and that (2) Defendants, by employing full-time chaplains, gave Christians continuous access to religious advisors but did not do the same for Muslims. (ECF No. 1 at PageID 8–9.) Plaintiff asserts that Defendants solicited only a volunteer imam who came to the Jail infrequently.

Defendants argue that religious leaders must be qualified, according to the Jail's criteria, to preach to inmates. (ECF No. 64 at PageID 666.) They assert that, although they employed no full-time imam, they sought to find additional qualified volunteer imams. (*Id*. at PageID 665); (ECF No. 24-2 at PageID 207.) They also assert that they tried to hire a

qualified full-time imam. (ECF No. 64 at PageID 665); (ECF No. 24-2 at PageID 207.) By all accounts, they did ultimately hire a full-time imam in 2012. (ECF No. 64 at PageID 665.)

Plaintiff's first claim, that Defendants refused to hire an imam, fails because he does not refute that Defendants ultimately hired an imam. (ECF No. 32-2 at PageID 395–96.) Defendants may not have hired an imam as quickly as Plaintiff would have liked, but that does not mean that Defendants refused to hire one. And Plaintiff offers no evidence about the availability of Imams in the area who would be willing to conduct services to inmates.

Furthermore, requiring religious leaders to have baseline qualifications appears rationally related to a legitimate governmental interest. *See Hayes*, 424 F. App'x at 550. Religious leaders have access to all areas of the Jail and minister to the inmates, putting them in positions of leadership. (ECF No. 24-1 at PageID 202–05.) It is reasonable for Defendants to want these persons to have a certain baseline of qualifications and training.

Plaintiff also had alternative means to practice Islam, either though volunteer-led Jumu'ah services or through Jumu'ah prayer-only services. (ECF No. 24-1 at PageID 198–99.) Again, *Hayes* does not require perfect adherence to an inmate's religious preferences. *See Hayes*, 424 F. App'x at 549–50. Instead, *Hayes* requires limitations justified by legitimate governmental interest that is rationally related to the limitation imposed. *See id*.

Lastly, the Court does not find evidence of ready alternatives to regulating religious leaders' qualifications. Plaintiff's alternative appears to be that Defendants should have hired a full-time imam earlier. The Court refrains from stepping into Defendants' shoes on its hiring decisions, especially when they ultimately gave Plaintiff his sought-for relief. *See Hayes*, 424 F. App'x at 549–50. As a result, the Court finds that Defendants' policy on hiring an imam did not violate Plaintiff's First Amendment rights.

### B. Defendants Did Not Violate Plaintiff's Fourteenth Amendment Rights.

The Equal Protection Clause of the Fourteen Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Essentially, the Clause mandates that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

To prevail on an Equal Protection claim, Plaintiff must show that Defendants treated Plaintiff differently from similarly-situated individuals and that this treatment stemmed from "intentional and purposeful discrimination." *Robinson*, 615 F. App'x at 314 (citing *Abdullah v. Fard*, No. 97-3935, 1999 WL 98529, at *2 (6th Cir. January 28, 1999)).

In the prison context, a court will not find a discriminatory intent if the policy in question is "rationally related to legitimate penological interests." *Id.*; *see Abdullah*, 1999 WL 98529, at *2 (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). Here, Plaintiff contends that Defendants' refusal to hold a post-Ramadan feast violates the Equal Protection Clause because Defendants give feasts on certain Christian holidays. (ECF No. 66 at PageID 678.)

But Plaintiff's Equal Protection arguments fail for the same reason that his similar Free Exercise argument did—the policy decision is rationally related to a legitimate governmental interest. *See Robinson*, 615 F. App'x at 314; *supra* Part V.A.3. The Record's lack of evidence showing that Defendants acted with discriminatory intent towards Plaintiff or other Muslims bolsters this analysis. As a result, the Court finds no genuine issue of material fact that Defendants violated Plaintiff's Fourteenth Amendment rights. As a result, Plaintiff's § 1983 does not survive summary judgment.

## CONCLUSION

For the above reasons, the Court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment. In doing so, it DISMISSES WITH PREJUDICE Plaintiff's Complaint.

**SO ORDERED**, this 7th day of September, 2018.

 s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE