## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| BOAZ PLEASANT-BEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:11-cv-02138-TLP-tmp |
| v. | ) | |
| | ) | |
| MARK H. LUTTRELL, JR., Shelby County | ) | |
| Mayor, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S OBJECTIONS TO THE MAGISRATE COURT'S ORDER, AND AMENDING SCHEDULING ORDER

Plaintiff sued the Shelby County Jail ("Jail) and various individual officers[1] for violating his religious rights.  (ECF No. 1.)  Defendants now move for summary judgment (ECF No. 129), and Plaintiff responded in opposition.  (ECF No. 141.)

For the reasons below, the Court **GRANTS** the motion in part and **DENIES** the motion in part.  The Court finds that Defendants had a legitimate, penological interest in having Gang Intelligence Unit ("GIU") officers monitor Muslim services.  There are, however, genuine issues of material fact about whether Defendants violated Plaintiff's Free Exercise and Equal Protection rights by: (1) limiting the length of Muslim service; (2) only allowing nine inmates[2] to attend

---

[1] These officers are Roy Rodgers (deceased), Julius Hawkins, James Coleman (deceased), Robert Moore, Rod Bowers, and Charlene McGhee ("Individual Defendants").  (*See* ECF No. 1 at PageID 1.)  The Sixth Circuit affirmed this district court's dismissal of Defendants Mark Luttrell and William Oldham.  (*See* ECF No. 49 at PageID 473.)

[2] It is not clear to the Court whether Plaintiff was a pretrial detainee or an inmate at the time of the alleged constitutional violations.  But because Plaintiff alleges that Defendants' violated the

Muslim services; (3) not providing nutritious meals during Ramadan; and (4) not providing the Id Ul Fitr feast.  And the Court finds that the Individual Defendants are not entitled to qualified immunity on these claims.

Plaintiff also objects to the Magistrate Court's order denying his motion to compel discovery.  (ECF No. 138.)  And he further moves to amend his response to Defendant's motion for summary judgment.  (ECF No. 140.)

The Court finds that the Magistrate Court's order was not clearly erroneous and **DENIES** Plaintiff's objections to the Magistrate Court's order.  But even so, Defendants did present new evidence with their motion for summary judgment.  For that reason, the Court finds that further discovery is necessary before trial.  The Court, therefore, **AMENDS** the scheduling order to allow for additional discovery.

## BACKGROUND

In 2011, Plaintiff sued the Shelby County Jail ("Jail") and various individual officers under 42 U.S.C. § 1983 for violating his religious rights.  (ECF No. 1.)  These alleged violations mainly occurred in late 2010.  (*Id.* at PageID 1, 8–9.)

Defendants moved for summary judgment.  (ECF No. 24.)  The district court granted Defendants' motion (ECF No. 37), and Plaintiff appealed (ECF No. 39).  In 2013, the Sixth Circuit reversed the district court in part and remanded for further proceedings.  (ECF No. 49.)

Both parties then moved for summary judgment.  (ECF Nos. 54 & 59.)  This Court found that Defendants did not violate Plaintiff's First Amendment rights, and so granted Defendants'

---

rights of Muslim "inmates," the Court refers to Plaintiff and other persons in the Jail as "inmates."  (*See* ECF No. 1.)

motion for summary judgment and denied Plaintiff's.  (ECF No. 105.)   On that basis, Plaintiff again appealed.  (ECF No. 108.)

The Sixth Circuit affirmed in part, reversed in part, and remanded three of Plaintiff's claims back to this Court.  (ECF No. 114.)  These three remaining claims are (1) that Defendants disparately restricted Muslim religious services and had GIU officers attend these services; (2) that Defendants deprived Plaintiff of a satisfactorily nutritious diet during the Ramadan fast; and (3) that Defendants did not provide an Id Ul Fitr feast at the end of Ramadan.  (*Id.* at PageID 885–88.)

Defendants now, for the third time, move for summary judgment on Plaintiff's claims. (ECF No. 129.)  Defendants argue that the Sixth Circuit's reversal "was based on its finding that the record evidence was lacking," and so Defendants now attach to their motion "the clarifying evidence that the Sixth Circuit found to be absent."  (ECF No. 129-1 at PageID 911–12.)  This new "clarifying evidence" includes a Ramadan Diet sheet from Aramark, the Jail's food provider, and declarations from George Askew, Robert Moore, Shirley Hayslett, and Julianna Croegaert.  (*Id.*; ECF Nos. 129-3, 129-4, 129-5, 129-6 & 129-7.)  What is more, Defendants also argue that the Individual Defendants are entitled to qualified immunity on all of Plaintiff's claims.  (ECF No. 129-1 at PageID 921.)

The Court now turns to the legal standard for a motion for summary judgment.

## **LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense."  *Bruederle v.*

*Louisville Metro Gov't*, 687 F.3d 771, 776 (6th Cir. 2012) (citing *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)).

"In considering a motion for summary judgment, [the] court construes all reasonable inferences in favor of the nonmoving party." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). And "[t]he moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." *Mosholder v. Barnhardt*, 679 F.3d 443, 448 (6th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Id.* at 448–49; *see also* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587. This means that, if "the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 914 (6th Cir. 2013) (quoting *Chapman v. United Auto Workers Loc. 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)); *see also Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012).

What is more, "to show that a fact is, or is not, genuinely disputed, both parties are required to either cite to particular parts of materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Bruederle*, 687 F.3d at 776 (internal quotations and citations omitted); *see also Mosholder*, 679 F.3d at 448 ("To support its motion, the moving party may show 'that there is an absence of evidence to support the nonmoving

4

party's case.'" (quoting *Celotex*, 477 U.S. at 325)).  But, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"  *Martinez*, 703 F.3d at 914 (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  As a result, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

Ultimately, the "question is whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 251–52).  "[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor."  *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (quoting *Liberty Lobby*, 477 U.S. at 251).  Also statements in affidavits that are "nothing more than rumors, conclusory allegations and subjective beliefs" are insufficient evidence.  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584–85 (6th Cir. 1992)

## ANALYSIS OF THE ALLEGED CONSTITUTIONAL VIOLATIONS

Defendants argue that this Court should grant their motion for summary judgment because "Plaintiff cannot make out a constitutional violation" against any Defendant.  (ECF No. 129-1 at PageID 912.)  But viewing the evidence in the light most favorable to Plaintiff, the Court finds that there are genuine issues of material fact over whether Defendants violated Plaintiff's constitutional rights.

The Court first discusses the standard for bringing a § 1983 claim and alleging a constitutional violation.  Then the Court addresses whether there are genuine issues of material fact as to Plaintiff's three remaining claims.

## I.   Liability Under § 1983

### A.   Liability of Individual Defendants

Under § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."  42 U.S.C. § 1983.  And so, under § 1983, plaintiffs can hold individual officers liable in their personal capacities for violating constitutional rights.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

In fact, "Section 1983 creates a 'species of tort liability' for constitutional violations." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 490 (6th Cir. 2020) (quoting *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017)).  This means that, to be liable under Section 1983, a defendant must be "personally involved in the unconstitutional action that caused plaintiff's injury."  *Id.* at 491.

### B.   Liability of Shelby County

Courts will hold municipalities or counties liable under § 1983 only if an unconstitutional policy or custom caused the plaintiff's injuries.  *See Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691–92 (1978).  To show municipal liability, Plaintiff must "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy."  *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)).  In

essence, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

## II.   Constitutional Violations and the *Turner* Standard

Courts analyze inmates' claims of constitutional violations under the framework set forth in *Turner v. Safley*, 482 U.S. 78 (1987).[3]  *Colvin v. Caruso*, 605 F.3d 282, 293 (6th Cir. 2010).  And under this framework, "prison regulations that impinge on an inmate's constitutional rights are valid if they are 'reasonably related to legitimate penological interests.'"  *Id.* (quoting *Turner*, 482 U.S. at 89.)

Courts consider four factors when analyzing the reasonableness of a prison regulation. *Turner*, 483 U.S. at 89.  The *Turner* test's four factors are

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.  If not, the regulation is unconstitutional, and the other factors do not matter.  Unlike the first factor, the remaining factors are considerations that must be balanced together: (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Colvin*, 605 F.3d at 293 (quoting *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999)).

As to the first factor—a rational connection between the regulation and the governmental interest—"if [it] is not met, the regulation is unconstitutional, and the other factors do not

---

[3] The *Turner* analysis applies to all inmates' constitutional claims, including both free exercise and equal protection claims.  *Washington v. Harper*, 494 U.S. 210, 224 (1990) ("We made quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights.").

matter." *Hanrahan v. Mohr*, 905 F.3d 947, 955 (6th Cir. 2018) (internal quotation omitted). "'The first *Turner* factor is multifold,' and requires that 'the governmental objective underlying the regulations at issue is [1] legitimate and [2] neutral, and that [3] the regulations are rationally related to that objective.'" *Id.* (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989)). And "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90.

The Court now considers Plaintiff's claims and whether Defendants' actions were rationally related to legitimate penological interests.

### A.    Whether Defendants' Disparate Worship Restrictions Violated Plaintiff's Constitutional Rights

Plaintiff alleges that Defendants violated his Free Exercise and Equal Protection rights by restricting Islamic services. [4]  (ECF No. 1 at PageID 4, 8–9.)  He alleges that (1) GIU officers attended Islamic services but not Christian ones; (2) only nine inmates could attend Muslim services on the Fourth Floor; and (3) the Jail allowed less than ten minutes for Muslim services, while Christian services lasted over an hour.  (*Id.*)  Plaintiff also filed affidavits from other inmates at the Jail, who affirmed these allegations.  (*See* ECF Nos. 28-4 at PageID 296; 28-5 at 297–98.)

---

[4] Plaintiff here alleges that Defendants' actions violated both his Free Exercise and Equal Protection rights.  "[T]he Free Exercise Clause protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Trinity Lutheran Church, Inc. v. Comer*, 137 S. Ct. 2012, 2015 (2017) (quoting *Lyng v. N.W. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)).  And the Equal Protection Clause "protects against arbitrary classifications, and requires that similarly situated people be treated equally." *Jackson v. Jamrog*, 411 F.3d 615, 618 (6th Cir. 2005) (quoting *Richland Bookmart, Inc. v. Nichols*, 278 F.3d 570, 574 (6th Cir. 2002)).

In its opinion considering Defendants' second motion for summary judgment, the Sixth Circuit found that "material fact disputes preclude summary judgment on these claims" because Defendants did "not explain the alleged disparate treatment of Islam, namely, the more onerous restrictions allegedly placed on Islamic but not Christian services." (ECF No. 114 at PageID 886.) That court also held that, "if these allegations are proven to be true—and absent adequate justification for the restrictions and the alleged *difference in treatment*—such disfavored treatment would likely violate both Free Exercise and Equal Protection." (*Id.* at PageID 886.) The question here, then, is whether Defendants had an adequate reason for restricting Muslim services.

Defendants argue that "any difference in treatment was not based on the religious make-up of Plaintiff or anyone else; it was purely a result of staffing and organizational circumstances in the Jail. And those differences were rationally related to the goals of security and order in the Jail." (ECF No. 129-1 at PageID 914.) They also attach a declaration from George Askew, a Unit Manager in the Jail during the relevant time. (ECF No. 129-3.)

The Court now turns to Defendants' legitimate penological interest in having GIU officers attend Muslim services.

### i.   Analysis of Defendants' Legitimate Penological Interest in Having GIU Officers Monitor Muslim Services

The Court finds that Defendants had a legitimate penological interest in having GIU officers monitor Muslim services. Mr. Askew explains that most inmates in the Jail identified as Christian, and that "the majority of inmates in any given Pod" attended the Jail's Christian services. (ECF No. 129-3 at PageID 938.) And "[b]ecause the majority of detainees in any given Pod identified as Christian, the Pod's hall security officer would routinely accompany the Pod to Christian religious services." (*Id.*) He says that, "from a security standpoint, this was

9

the most practical way" to regulate the services, "because the hall security officer of a given area or floor was in the best position to monitor the individuals in that Pod; he or she would be more likely to know about any rivalries between detainees in that Pod, or any other disciplinary issues that may arise from that particular Pod during transport or the services themselves." (*Id.*)

He further explains that, "because there was no single Muslim Pod, nor was there a Pod that was majority Muslim," hall security officers could not accompany Muslim inmates to their services. (*Id.* at PageID 939.) Thus, "Muslim services were monitored by GIU rather than Pod officers for staffing and logistical reasons," not because of any animus. (*Id.*)

Mr. Askew also states that, because inmates from different Pods attended Muslim services, "the likelihood of having unpredictable altercations during Muslim services was heightened," and so the Jail needed "extra security" at Muslim services. (*Id.* at PageID 939–40.) This is because inmates from different Pods may have rivalries with inmates staying in other Pods in the facility. "Jail personnel had no knowledge of what rivalries may have existed between the detainees from different Pods." (*Id.* at PageID 939.)

Plaintiff disputes Mr. Askew's declaration. First, he argues that Defendants did not keep track of inmates' religious preferences. (ECF No. 141 at 1006.) And he swears that pod officers did not monitor Christian services.[5] (ECF No. 141-1 at 1024.) Plaintiff further says that he never saw any fights, arguments, or disruptions in the Fourth Floor Jumu'ah services that would create heightened security concerns. (*Id.*)

The Court finds here that Defendants had a legitimate penological interest in having GIU officers monitor Muslim services. First, the Court asks whether there is a "valid, rational

---

[5] The Court cites Plaintiff's response to Defendants' motion for summary judgment, but he also swears to these facts in an attached affidavit. (*See* ECF Nos. 141 & 141-1.)

connection" between this restriction and Defendants' asserted interests.  *See Turner*, 482 U.S. at

89.  Relying on Mr. Askew's declaration, Defendants explain that GIU officers monitored

Muslim services for security reasons.

"Maintaining security constitutes a legitimate penological interest."  *Thompson v.*

*Campbell*, 81 F. App'x 563, 567 (6th Cir. 2003).  Plus, "[w]hen determining whether a

particular restriction is reasonably related to prison security, the court should give considerable

deference to prison administrators' expertise."  *Walker v. Mintzes*, 771 F.2d 920, 930 (6th Cir.

1985); *Hayes v. Tennessee*, 424 F. App'x 546, 550 (6th Cir. 2011) ("As maintaining security,

order, and discipline are essential goals of a corrections system, prison officials are accorded

wide latitude in the adoption and application of prison policies and procedures.").

Mr. Askew's affidavit asserts that GIU officers monitored Muslim services because the

inmates in attendance were from different pods.  And this posed a heightened security risk and a

manpower issue because there were no hall security officers familiar with all the inmates

attending the Muslim services.  Mr. Askew explains, "[s]ecurity and safety are paramount in a

Jail environment, and one of the most helpful tools a Corrections Deputy can have is

information regarding any feuds or rivalries between inmates.  Without that information,

additional security measures are necessary to allow Jail personnel to swiftly respond to any

altercations between detainees."  (ECF No. 129-3 at PageID 940.)

By contrast, Defendants explain that GIU officers did not need to monitor Christian

services because they did not pose the same risk.  Inmates attended Christian services by pods,

and a hall security officer—familiar with those inmates—monitored the services.  Considering

this evidence, there is a "logical connection between the regulation and the asserted goal" of

maintaining security, and that connection is not "so remote as to render the policy arbitrary or

irrational." *See Turner*, 482 U.S. at 89–90.  All in all, the Court finds that Defendants' security concerns are a rational, neutral reason for GIU officers to monitor Muslim services and not Christian services.

The other *Turner* factors also weigh in favor of Defendants here.  First, the regulation does not deprive Muslim inmates of all alternative ways to exercise their religious rights.  Even with GIU officers in attendance, Muslim inmates may still participate in the services without interference from the officers.  *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987) (finding that a prison policy that prevented inmates from attending Jumu'ah services did not violate the inmates' free exercise rights, partly because the prison did not "deprive[] [the plaintiffs] of all forms of religious exercise.").

Next, Defendants have also shown that having GIU officers attend Muslim services is necessary, not only to combat the heightened security risk, but also for staffing and logistical reasons.  (ECF No. 129-3 at PageID 939.)  Finally, Defendants say they cannot "segregate all Muslim detainees into a single 'Muslim Pod,'" and that no single hall security officer can monitor all Muslim inmates because "they were scattered throughout the Jail."  (*Id.* at PageID 938–99).  As a result, it is unclear that there were other feasible ways to address the security risks posed by having inmates from different pods attend Muslim services.

In sum, the Court finds that, under the *Turner* factors, Defendants' security and logistical concerns are legitimate reasons for having GIU officers attend Muslim services.  And so the Court **GRANTS** Defendants' motion for summary judgment as to this claim.

### ii.    Analysis of Defendants' allegedly Legitimate Penological Interest in Limiting Muslim Services to Nine Inmates for Less than Ten Minutes

There is a material issue of fact about whether Defendants had a justifiable reason for (1) allowing only nine inmates to attend Muslim services; and (2) limiting the length of Muslim services to between five and seven minutes.

In his declaration, Defendant Askew says that, for the same reasons GIU officers monitored Muslim services, "any restrictions on the number of detainees in a GIU-monitored service may have been more limited than the number of inmates allowed in services conducted per-pod." (ECF No. 129-3 at PageID 940.) Though he was unaware of any religious services that the Jail limited to less than an hour, such a limitation "would have been necessary to and consistent with the goal of limiting the number of inmates from different pods being allowed in a room at one time." (*Id.*)

But Plaintiff points out that thirty-five to forty inmates attended Christian services. (ECF No. 141 at 1008.) And he claims that those services lasted for at least an hour. (*Id.*) By contrast, Plaintiff says that the Jail allowed only nine inmates to attend Friday Jumu'ah services. (*Id.*) What is more, GIU Officers ended those services after only five to seven minutes of prayer. (*Id.* at PageID 1009.) Plaintiff further claims that he never saw any fights, arguments, or disruptions in the Fourth Floor Jumu'ah services that would have caused any heightened security concerns.[6] (*Id.*) The affidavits of other inmates support Plaintiff's claims that twenty to thirty inmates attended Christian services; that only nine inmates attended Muslim services;

---

[6] Plaintiff also challenges Mr. Askew's credibility over these issues. He argues that he never saw Mr. Askew at any of the Fourth Floor religious services, and notes that Mr. Askew himself "does not assert that he was present on the 4th Floor of the Jail during the relevant time-frame." (*Id.* at n.1.)

that Christian services lasted an hour; and that the Jail limited the Muslim services to less than

ten minutes.  (ECF Nos. 28-4; 28-5; 28-17.)

Based on the record and viewing it in the light most favorable to Plaintiff, there is a

dispute of material fact over whether Defendants restricted the Muslim services as alleged and

whether Defendants' security interests justified these alleged restrictions.  The Court again turns

to the *Turner* factors.

The first *Turner* factor—whether there is a valid, rational connection between the prison

regulation and the legitimate governmental interest put forward to justify it—weighs in favor of

Plaintiff here.  This is because Defendants' explanation of security reasons to justify its need to

limit the length and number in attendance for Muslim services is mostly unsupported.  While

the Court gives jail officials deference on security matters, there still must be a "valid, rational

connection" between the security concern and the alleged restriction.  *Turner*, 482 U.S. at 89.

What is more, the jail "cannot merely assert that its interests require restrictions" on a prisoner's

constitutional rights; instead, it "must prove the necessity of any restriction it imposes."

*Walker*, 771 F.2d at 929.  And Defendants fail so far to provide evidence that these restrictions

were necessary here.

The Sixth Circuit has often found that there must be evidence supporting the

government's proposed penological interest in an unconstitutional policy or practice.  *See Am.*

*Civ. Liberties Union Fund v. Livingston Cnty.*, 796 F.3d 636, 647 (6th Cir. 2015) (finding that

defendants lacked a legitimate penological interest for regulating legal mail when "[n]othing in

the record suggests that the parade of horribles advanced by the Defendants would occur if the

Jail is required to deliver properly marked legal mail"); *Flagner v. Wilkinson*, 241 F.3d 475, 486

(6th Cir. 2001) (finding that the first *Turner* factor weighed heavily in favor of the plaintiff

because there were no facts on the record supporting defendants' proposed penological interest); *Muhammad v. Pitcher*, 35 F.3d 1081, 1085 (6th Cir. 1994) (finding that there must be evidence on the record supporting defendant's claim that a policy furthers a legitimate penological interest).

And here, the evidence fails to eliminate a genuine dispute over whether Defendants limited the number of inmates in Muslim services and the length of those services and, if they did so, why.  Plaintiff argues persuasively that Defendants have not explained how limiting the number of Muslim inmates at a service to nine or restricting the length for that service to ten minutes eliminates a security risk while also allowing thirty inmates to attend a Christian service for an hour at a time.  (ECF No. 141 at PageID 1008 n.7.)

In fact, Mr. Askew stated that "the more detainees in a room at a time (especially with potential, unknown rivalries), the greater the security threat."  (ECF No. 129-3 at PageID 940.) To that end, Plaintiff claims that often, Defendants did not monitor Christian services.  (ECF No. 141 at 1009.)  He also argues that Defendants never cited any specific incidents in Muslim (or Christian) services that would justify limiting the length of Muslim services or the number of inmates who could attend.  (*Id.* at PageID 1009.)  Nor did Mr. Askew swear in his declaration that he personally attended any of the Fourth Floor services during the relevant time.  Or, that he knew of any incidents that had occurred which justified limiting Muslim services in this way. Besides, Defendants addressed any increased security risks by having GIU officers monitor those services.  So based on the evidence on the record, there is a genuine dispute about the legitimacy of these restrictions on Muslim services.

Plus, the other *Turner* factors also weigh in favor of Plaintiff here.  There is no evidence that Plaintiff had alternative ways to exercise his religious rights.  By allowing so few inmates

to attend, it is not clear that every Muslim inmate on the Fourth Floor had a chance to attend services.  And a service that lasts only ten minutes is not a reasonable alternative to a service that normally lasts an hour.  (*See* ECF No. 28-7 at PageID 309.)

Nor is there compelling evidence that accommodating Plaintiff's constitutional rights would have damaged the guards, other inmates, or prison resources.  And there were also plenty of reasonable alternatives—an extra GIU officer could have attended the services.  Or the Jail could have held smaller services that lasted longer.

In the end, Plaintiff presents evidence disputing Defendants' reasons for restricting the length of Muslim services and the number of inmates allowed to attend.  And, the "question is whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Johnson*, 777 F.3d at 843.  The Court finds that the evidence is not "so one-sided" here.

Viewing the evidence in the light most favorable to Plaintiff, there are material fact disputes about whether the Jail had a policy or practice of restricting the attendance and length of Muslim services without reasonable justification, and whether they acted with discriminatory intent by treating Muslims differently from Christians.  And so the Court **DENIES** summary judgment on these claims.

### B.      Whether Defendants Violated Plaintiff's Right to a Nutritious Religious Diet

The Court also finds that there is a genuine issue of material fact over whether Defendants violated Plaintiff's right to a nutritious religious diet.  Plaintiff claims that Defendants failed to provide nutritionally adequate Ramadan meals.  (ECF Nos. 1 at PageID 5; 59 at PageID 569).  He alleges that the meals were smaller, he lost ten pounds during Ramadan, and that the meals caused abnormal stomach aches.  (ECF No. 59-2 at PageID 585–86.)

The Sixth Circuit has found that inmates have a right to an adequate diet that does not violate their religious dietary restrictions. *Welch v. Spaulding*, 627 F. App'x 479, 482 (6th Cir. 2015); *Colvin v. Caruso*, 605 F.3d 282, 290 (6th Cir. 2010); *Alexander v. Carrick,* 31 F. App'x 176, 179 (6th Cir. 2002). What is more, on appeal of this case, the Sixth Circuit found that "[a] prisoner has a right under the Free Exercise Clause to a nutritious diet during Ramadan." (ECF No. 114 at PageID 887 (citing *Welch*, 627 F. App'x at 483 (6th Cir. 2015)).

In their original motions for summary judgment, Defendants did not argue that the Jail's Ramadan meals were nutritionally adequate—instead, they showed that a nutritionist approved the meals. (*Id.*) The Sixth Circuit found that was not enough and that "a genuine issue of material fact exists as to whether [Plaintiff] received a nutritionally adequate diet during Ramadan." (ECF No. 114 at PageID 887.)

Defendants now attach a Ramadan Diet Guide that they argue shows the nutritional adequacy of the meals. (ECF No. 129-6.) And they attach declarations from Aramark Senior Food Director Shirley Hayslett and Aramark Dietitian Julianna Croegaert. (ECD Nos. 129-5 & 129-7.) Ms. Hayslett explains that the Ramadan Diet Guide "serves as a reference guide for meal preparation for inmates during 2010 and 2011 in the Shelby County Jail who were observing the Ramadan fast." (ECF No. 129-5 at PageID 945.) And Ms. Croegaert states that the meals listed on the meal guide "are sufficient to provide for the nutritional health and wellbeing of any inmates who only receive" two daily meals during Ramadan. (ECF No. 129-7 at PageID 948.) As a result, Defendants argue that the Court should grant them summary judgment on this claim. (ECF No. 129-1 at PageID 921.)

That said, Plaintiff disputes that the Jail followed this Ramadan Diet Guide. (ECF No. 141 at PageID 1011.) He says that "he [has] never been fed that menu during any year he was

housed at the Jail." (*Id.*)  And that the Ramadan breakfast and dinner meals "were the exact same meals fed to the general population" of the Jail.  (*Id.*)  Plus, while Defendants say they used the Ramadan diet sheet as a "reference guide" during the relevant timeframe, they do not provide evidence that, in practice, they followed the Ramadan Diet Guide.

Based on this evidence, there is a question of material fact about whether Defendants followed the Ramadan Diet Guide and gave Plaintiff nutritious meals during Ramadan.  And "the question of whether a prison official has knowingly provided a nutritionally inadequate diet is a fact-specific inquiry that requires consideration of, inter alia, daily caloric content, duration of the diet, and the nutritional needs of the prisoner."  *Welch,* 627 F. App'x at 483.

In the end, the new evidence Defendants attach to their motion for summary judgment is not "so one-sided that [Defendants] must prevail as a matter of law."  *See Johnson*, 777 F.3d at 843.  Viewing the facts in the light most favorable to Plaintiff, there remains a genuine issue of material fact over whether he received a nutritionally adequate diet during Ramadan and whether Defendants acted with discriminatory intent.  With that in mind, the Court **DENIES** summary judgment as to Plaintiff's Ramadan diet claim.

## C.      Whether Defendants Violated Plaintiff's Right to an Id Ul Fitr Feast

Plaintiff alleges that Defendants violated his Free Exercise and Equal Protection rights by refusing to provide the Id Ul Fitr feast.  (ECF Nos. 1 at PageID 5; 59 at PageID 569).  And the Sixth Circuit found that, "[a]bsent a legitimate penological justification, the lack of opportunity to participate in Id Ul Fitr could violate a Muslim prisoner's Free Exercise rights."  (ECF No. 114 at PageID 886.)

Defendants now provide an allegedly legitimate penological justification for not providing the feast.  First, they argue that there were no funds for the feast.  (ECF No. 129-1 at

PageID 918.)  Second, that the Jail spent funds on other accommodations for Muslims.  (*Id.*)  To that end, Defendants argue that "[t]he Jail was not required to treat populations of different sizes, each of which had unique accommodation requests, identically in every way, especially in light of limited funds."  (ECF No. 129-1 at PageID 919.)

But Plaintiff disputes this.  He argues that Defendants paid for every inmate to eat a Christmas meal that included turkey, dressing, sweet potatoes, cranberry sauce, sweet potato pie, and juice.[7]  (ECF No. 59-2 at PageID 586.)  And he says Defendants decorated every wall in every Pod for Christmas.  (*Id.*)  What is more, he claims that Defendants held a three-day revival with food for Christian inmates only.  (*Id.*; *see also* ECF No. 114 at PageID 886.)  He therefore argues that Defendants had enough resources to provide the feast for Muslim inmates.

In like manner, Plaintiff disputes that Defendants spent more money and resources accommodating Muslim inmates.  (ECF No. 141 at PageID 1011.)  Indeed, Defendants only list two ways they accommodated Muslim inmates—by creating a special pork-free diet at the Jail and accommodating Muslims during the Ramadan fast.  (ECF No. 129-4 at PageID 943.)  But Plaintiff argues that Defendants created a pork-free diet for the Jail before the relevant time frame of this case. (ECF No. 141 at PageID 1011.)  And he argues that Defendants did not spend extra money or resources on Ramadan.  He claims that the Ramadan breakfast and dinner meals "were the exact same meals fed to the general population" of the Jail.  (*Id.*)  Also Plaintiff claims that he served Muslim inmates their breakfast meals and dinner meals, not the Jail's staff.  (*Id.*)

---

[7] The food served at the Christmas meal is like the food Plaintiff says he traditionally eats at the Id Ul Fitr feast—turkey, lamb, chicken, rice, dates, and vegetables.  (ECF No. 59-2 at PageID 587.)

On appeal, the Sixth Circuit considered Defendants' arguments about its lack of funds, and still found that "genuine issues of material fact exist as to whether defendants had a legitimate penological justification for not offering an Id Ul Fitr meal and whether they acted with discriminatory intent by treating Muslims differently from Christians." (ECF No. 114 at 887.) The Court finds that the Sixth Circuit's opinion still controls here because Defendants do not present any new evidence about its funding that changes the Sixth Circuit's reasoning.[8] And, in any event, Plaintiff disputes the accuracy of Defendants' claim that they spent money accommodating Muslims.

All in all, taking the record in the light most favorable to Plaintiff, there are genuine issues of material fact on whether Defendants had a legitimate penological justification for not offering the Id Ul Fitr Feast, and whether Defendants acted with discriminatory intent. The Court therefore **DENIES** Defendants' motion for summary judgment on this claim.

## ANALYSIS OF QUALIFIED IMMUNITY CLAIMS

The Individual Defendants argue first that they did not violate Plaintiff's religious rights because their actions were "at least reasonably related to legitimate penological interests." (ECF No. 129-1 at PageID 916.) And even if they did violate Plaintiff's constitutional rights, the Individual Defendants argue that they are entitled to qualified immunity because they did not violate clearly established law. (*Id.* at PageID 922–23.) Before addressing the merits of this argument, the Court first turns to the qualified immunity standard.

---

[8] The Court does not analyze Defendants' interest under the *Turner* factors because Defendants here assert the same legitimate penological interest that the Sixth Circuit considered. And the Court finds that, because Defendants make the same argument without providing additional compelling evidence, it has to follow the Sixth Circuit's finding that there is a genuine issue of material fact about whether Defendants had a legitimate penological interest here.

## I.      Qualified Immunity Standard

Government officials "are immune from civil liability, unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (citing *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)).  To determine whether qualified immunity applies, a court must decide (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal references and citations omitted).  Under this standard, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The doctrine allows government officials "breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (citations and quotations omitted). The Sixth Circuit "has long recognized that the purpose of this doctrine is to protect officers 'from undue interference with their duties and from potentially disabling threats of liability.'" *Nelson v. City of Battle Creek, Mich.*, No. 18-1282, 2020 WL 916966, at *2 (6th Cir. Feb. 26, 2020) (quoting *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005)).  "Once the defending officer raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity." *Id.* (citing *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013); *Coble v. City of White House*, 634 F.3d 865, 870–71 (6th Cir. 2011)).

**II.      Whether Defendants Violated Plaintiff's Constitutional Rights**

As explained above, the Court finds that there are genuine issues of material fact on whether Defendants violated Plaintiff's constitutional rights by (1) limiting the length of Muslims services and the number of inmates who could attend; (2) not providing nutritious Ramadan meals; and (3) not providing the Id Ul Fitr feast.  And so, the Court now addresses whether the law clearly established those rights at the time of the alleged violations.

**III.     Whether Case Law Clearly Established Plaintiff's Constitutional Rights**

Government officials lose their immunity when "in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins*, 805 F.3d at 765.  A "clearly established right" is one "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664(2012)).  Case law often defines those established rights.

"There need not be 'a case directly on point' for the law to be clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Nelson*, 2020 WL 916966, at *3 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).  "To violate a plaintiff's clearly established right, an officer's conduct must be such that, at the time of the allegedly-violative conduct, the contours of that right were sufficiently defined that every 'reasonable official would have understood that what he is doing violates that right.'"  *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In determining whether a right is clearly established, the Court looks to decisions of the Supreme Court, then to decisions of the Sixth Circuit, and finally to other courts of appeal, and asks whether these precedents placed the constitutional question at issue "beyond debate."

*Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013) (citing *Ashcroft*, 563 U.S. at 741).

District court decisions do not create clearly established law. *See Camreta v. Greene*, 563 U.S.

692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in

either a different judicial district, the same judicial district, or even upon the same judge in a

different case. . . . Otherwise said, district court decisions—unlike those from the courts of

appeals—do not necessarily settle constitutional standards or prevent repeated claims of

qualified immunity." (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02(1)(d), p.

134–36 (3d ed. 2011)).

The Court now considers whether case law clearly established these rights at issue here:

(1) the right of inmates to pursue their faith, as compared to the opportunity given to other

inmates of a different faith;[9] (2) the right to a nutritious religious diet; and (3) the right to

celebrate the Id Ul Fitr feast.[10]

### A.   Genuine Issue of Material Fact Over Whether Defendants Violated Plaintiff's Clearly Established Right to Pursue his Faith

Plaintiff argues that the prison treated Muslim and Christian inmates differently without

reasonable justification. (ECF No. 1 at PageID 4, 8–9.) First, Defendants allegedly limited the

number of inmates who could attend Muslim services to nine inmates, but allowed over thirty

---

[9] Neither party addresses how the Court should characterize Plaintiff's claim that Defendants restricted Muslim services but not Christian ones.

[10] Plaintiff bears the burden to show that the Individual Defendants are not entitled to qualified immunity. *Nelson*, 2020 WL 916966, at *2. And while he spends most of his response arguing that Defendants violated his constitutional rights, he does not argue that the law clearly established those rights. (*See* ECF No. 141.) His arguments that Defendants violated his constitutional rights, however, rebuts their qualified immunity claims. Plus, Plaintiff addressed qualified immunity in his response to Defendants' second motion for summary judgment, arguing that "qualified immunity cannot be provided to guilty officials who knowingly deprive the Plaintiff of clearly established constitutional rights," and that Defendants "intentionally" violated his constitutional rights. (ECF No. 59 at PageID 578.)

inmates to attend Christian services.  (*Id.*)  And second, they allegedly limited the length of Muslim services to five to seven minutes, while allowing Christian services to last an hour.  (*Id.*)  Defendants now argue that "Plaintiff cannot show that such restrictions, in light of the pragmatic realities Askew lists, fell within clearly established Free Exercise or Equal Protection jurisprudence at that time."  (ECF No. 129-1 at PageID 923.)  This Court disagrees.

"Although prisoners obviously do not retain the same freedom to exercise their religion as they would in the world outside the prison, they may not be denied basic rights of conscience."  *Thompson v. Commonwealth of Ky.,* 712 F.2d 1078, 1080 (1983).  Jail officials thus cannot deny inmates a reasonable opportunity to practice their religion.  *See Cruz v. Beto*, 405 U.S. 319, 322 (1972); *Cooper v. Pate*, 378 U.S. 546, 546 (1964).  What is more, the Supreme Court has found that, if an inmate "was denied reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts, then there was palpable discrimination by the State."  *Id.* at 1081.  It is, therefore, clearly established that jail officials cannot deny inmates the reasonable opportunity to pursue their faith, as compared to the opportunity afforded to other prisoners of a different faith.  And this is in essence the right that Plaintiff asserts here.

Even so, prison officials may restrict inmates' religious opportunities if they have a legitimate penological interest in doing so.  *See Turner*, 482 U.S. at 85.  And if they have a legitimate reason, prison officials can treat inmates of different faiths differently.  For example, in *Cruz v. Beto*, the Supreme Court noted that "[a] special chapel or place of worship need not be provided for every faith regardless of size."  405 U.S. at 323 n.2.  What is more, in *Thompson v. Commonwealth of Kentucky*, the Sixth Circuit found that prison officials did not violate the Free Exercise or Equal Protection clauses when they only allowed Muslim inmates

6.5 hours of Islamic services a week, but provided 23 hours of Christian services.  712 F.2d 1078, 1080–81 (6th Cir. 1983).  The court found that plaintiffs "have not been denied a basic right of conscience" because the prison did, in fact, allow Muslim inmates to have weekly services.  *Id.* at 1080.  And the court emphasized that the Free Exercise Clause "does not insure that all sects will be treated alike in all respects."  *Id.* at 1081.

That said, the Court here found that there is a genuine issue of material fact over whether Defendants had a legitimate penological interest in limiting the attendance and length of Muslim services.  As a result, there is similarly a genuine issue of material fact over whether the individual Defendants violated clearly established law by denying Muslim inmates a reasonable chance to pursue their faith as compared to Christian inmates, without a legitimate penological interest.  Of course, Defendants will have a chance to answer these questions of fact at trial. But on these grounds, the Court **DENIES** Defendants' motion for summary judgment on this claim.

### B.   Case Law Clearly Established the Right to a Nutritious Religious Diet

Next, the Court turns to whether case law clearly established Plaintiff's right to a nutritionally adequate diet.  And, for reasons stated below, the Court finds that it did.

In 2002, the Sixth Circuit found that inmates have a right to an adequate diet that does not violate their religious dietary restrictions.  *Alexander v. Carrick,* 31 F. App'x 176, 179 (6th Cir. 2002)).  The court held that, "[i]f the prisoner's diet, as modified, is sufficient to sustain the prisoner in good health, no constitutional right has been violated."  *Id.*  And in its 2010 opinion, *Colvin v. Caruso*, the Sixth Circuit found that its case law clearly established this right—that is, an inmate's right to "an adequate diet" that did not violate the inmate's religious beliefs.  605 F.3d 282, 290 (2010); *see also Welch v. Spaulding*, 627 F. App'x 479 (6th Cir. 2015)  ("In

*Colvin*, we held that it was clearly established in the First Amendment context that 'prison administrators must provide an adequate diet without violating the inmate's religious dietary restrictions.'").

And almost every other circuit court agrees that inmates have a right to a diet consistent with their religious beliefs. *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (finding it "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples"); *DeHart v. Horn*, 227 F.3d 47, 52 (3d Cir. 2000) (finding that inmates have a right to a diet that aligns with their sincerely held religious beliefs); *Lovelace v. Lee*, 472 F.3d 174, 199 (4th Cir. 2006) (finding that prisoners have a clearly established right to a diet consistent with their religious beliefs); *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (finding that "a prisoner is entitled to practice his religion insofar as doing so does not unduly burden the administration of the prison," and so material issue of fact existed about whether prison officials violated inmate's religious rights by giving him meals containing pork); *Love v. Reed*, 216 F.3d 682, 689 (8th Cir. 2000) (finding that "prison inmates are entitled to reasonable accommodation of their religious dietary needs"); *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987) (holding that "inmates . . . have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion."); *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1214 (10th Cir. 1999) (finding that prison officials violated inmate's free exercise rights by not providing Ramadan meals). *But see Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007) (finding that "prisons need not respond to particularized religious dietary requests to comply with the First Amendment.")

All in all, the law in the Sixth Circuit clearly established a right to a nutritious religious diet at the time of the alleged constitutional violations here. Plus, the consensus of the other

circuit courts of appeals also suggests that this right was "beyond debate," and that a reasonable officer considering this precedent would have known that Plaintiff had a right to a nutritious Ramadan diet. *See Hearring*, 712 F.3d at 280. Defendants, therefore, are not entitled to qualified immunity on this claim.

### C.      Case Law Clearly Established the Right to an Id Ul Fitr Feast

The Court now considers whether Plaintiff had a clearly established right to an Id Ul Fitr Feast in 2010 and 2011. This is a close call, but recent Sixth Circuit precedent provides guidance. In *Maye v. Klee*, the Sixth Circuit, considered a qualified immunity claim for violations in 2013, and found that case law at that time clearly established an inmate's right to participate in an Eid al-Fitr feast. 915 F.3d 1076, 1087 (6th Cir. 2019).[11] One reason the Court found a clearly established right is because a district court had ordered the prison to hold the feast. *Id.* But, more importantly, the court found that other case law "would also suffice to show the rights were clearly established in 2013 and 2014." *Id.* This case law includes the following: *Whitney v. Brown*, 882 F.2d 1068, 1073–74 (6th Cir. 1989); *Turner*, 482 U.S. at 89; *Fowler v. State of R.I.*, 345 U.S. 67, 69–70 (1953); and *Harbin-Bey v. Rutter*, 420 F.3d 571, 576 (6th Cir. 2005).

So the Sixth Circuit found that these four cases clearly established the right to the Id Ul Fitr feast. And courts decided each of these cases—*Whitney*, *Turner*, *Fowler*, and *Harbin-Bey*—before 2010. So, in sum, the Sixth Circuit's opinion in *Maye* reveals that case law

---

[11] When deciding whether a right is clearly established for qualified immunity purposes, courts look to case law decided before the alleged constitutional violation took place. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This means that, even if a later opinion clearly establishes a right, the court cannot consider that opinion when deciding whether the right was clearly established. *See id.* As a result, the Court here cannot rely on *Maye v. Klee* to find that the right was clearly established in 2010. But the Court can still look to the Sixth Circuit's opinion for guidance on the state of the law during the relevant timeframe here.

established a right to an Id Ul Fitr feast before 2010.[12]  With that in mind, this Court follows the

Sixth Circuit opinion in *Maye* and finds that case law clearly established Plaintiff's right to an

Id Ul Fitr feast.  This means that the Individual Defendants are not entitled to qualified

immunity on this issue.

<u>**PLAINTIFF'S CLAIMS AGAINST DEFENDANT MCGHEE**</u>

Defendants argue that Plaintiff no longer states a claim against Defendant Charlene

McGhee.  (ECF No. 129-1 at PageID 923.)  This is because Plaintiff's only remaining claims

relate to Defendants' restriction of Muslims services; their inadequate Ramadan meals; and their

failure to provide an Id Ul Fitr feast.  (*Id.*)  A complaint "must allege that the defendants were

personally involved in the alleged deprivation of federal rights."  *Frazier v. Michigan*, 41 F.

App'x 762, 764 (6th Cir. 2002); *see also Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008).

But Defendants argue that Plaintiff's complaint "does not attribute any specific actions to

[Defendant McGhee]."  (ECF No. 129-1 at PageID 924.)

The Court finds, however, that Plaintiff does allege Defendant McGhee's involvement.

First, his complaint alleges that she (along with the other Individual Defendants) restricted

Muslim services and did not provide adequate Ramadan meals or the Id Ul Fitr feast.  (ECF No.

1 at PageID 4.)  True enough, Plaintiff often alleges that all the Individual Defendants violated

his constitutional rights.  (*See* ECF Nos. 1; 59).  That said, in his affidavit, Plaintiff says that

"Defendants Moore, Bowers, Hawkins, McGhee, Davis, Rodgers, and Shelby County"

accommodated Christian holidays but not Muslim ones.  (ECF No. 59-2 at PageID 586.)  Plus,

---

[12] Also two other circuit courts had found that inmates have a right to attend an Id Ul Fitr feast.
*Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (finding inmates have a clearly established
right to an Eid-ul-Fitr meal); *see also Parks-El v. Felming*, 212 F. App'x 245, 248 (4th Cir.
2007).

in his first motion for summary judgment, he also states that "McGhee . . . had personal involvement in the constitutional injuries." (ECF No. 59 at PageID 578.)

In fact, Defendant McGhee's own affidavit states that she was the Assistant Chief of Security of the Jail and was responsible for security at the Jail during the relevant timeframe. (ECF No. 24-6 a PageID 230.)  This lends credibility to Plaintiff's claims that Defendant McGhee restricted Muslim services.  Plus, Defendants do not put up any new evidence to dispute Plaintiff's allegations against Defendant McGhee for these three claims.

The Court has to view the evidence in the light most favorable to Plaintiff.  And, with the evidence before it, the Court finds that there is a genuine issue of material fact on whether Defendant McGhee was personally involved in the conduct underlying Plaintiff's three remaining claims.  The Court therefore **DENIES** Defendants' motion for summary judgment as to Defendant McGhee.

## PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE COURT'S ORDER AND HIS MOTION TO AMEND

Plaintiff Boaz Pleasant-Bey ("Plaintiff") objects to the Magistrate Court's order on his motion to compel.  (ECF No. 138.)  Plaintiff also moves for leave to amend his response to Defendants' motion for summary judgment.  (*See* ECF No. 140.)

Before responding to Defendants' motion for summary judgment, Plaintiff moved to compel evidence from Defendants under Federal Rule of Civil Procedure 56(d).  (ECF No. 133.)  This Court referred the motion to the Magistrate Court for determination (ECF No. 134), and it denied the motion.  (*See* ECF No. 136.)  Plaintiff then filed a notice of objections to the Magistrate Court's order (ECF No. 138), and Defendants responded in opposition.  (ECF No. 143.)  Plaintiff now requests leave to amend his response to Defendants' motion for summary

judgment because he has "objections pending before this Court to the Magistrate Court's Order denying his Motion to Compel."  (ECF No. 140 at PageID 1003.)

## I.      This Court's Standard of Review

Under 28 U.S.C. § 636(b)(1)(A), the Court may designate a magistrate judge to hear and determine any pretrial matter.  The Court may reconsider a pretrial determination made by a magistrate judge "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(a).

The clearly erroneous standard applies to the magistrate judge's factual findings, while the contrary to law standard applies to the magistrate's conclusions of law.  *United States v. Hofstetter*, 423 F. Supp. 3d 502, 505 (E.D. Tenn. 2019).  A factual finding is clearly erroneous when, "although there is evidence to support it, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir. 1993) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)); *see also Hofstetter*, 423 F. Supp. 3d at 505; *Cratty v. City of Allen Park*, No. 17-11724, 2018 WL 3983806, at *1 (E.D. Mich. June 14, 2018).  "A decision is contrary to law if it contradicts or ignores applicable precepts of law, as found in the Constitution, statutes, or case precedent."  *Hoftstetter*, 423 F. Supp. 3d at 505 (internal quotations and alterations omitted).

## II.     The Rule 56(d) Standard

Under Federal Rule of Civil Procedure 56(d), a nonmovant responding to a motion for summary judgment may show by affidavit or declaration that, "for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d).  "The [nonmovant's] affidavit must 'indicate to the district court the party's need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information.'"  *Doe v. City of*

*Memphis*, 928 F.3d 481, 490 (6th Cir. 2019) (quoting *Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004)).

The nonmovant thus bears the burden of showing "why he could not oppose the summary judgment motion by affidavit and how postponement of a ruling on the motion would enable him to rebut [the movant's] showing of the absence of a genuine issue of material fact." *Emmons v. McLaughlin*, 874 F.2d 351, 356 (6th Cir. 1989). If the nonmovant makes this showing, the Court may either defer or deny the motion for summary judgment; allow time for discovery; or issue any other appropriate order. Fed. R. Civ. P. 56(d)(1)–(3).

When the Sixth Circuit reviews a district court's ruling on a Rule 56 motion for additional discovery, it considers five factors:

> (1) when the appellant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the appellant was dilatory in its discovery efforts; and (5) whether the appellee was responsive to discovery requests.

*Doe*, 928 F.3d at 491 (quoting *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008)). The Sixth Circuit has suggested that a district court also consider these factors when deciding a Rule 56(d) motion. *See id.*

The Court now examines whether the Magistrate Court's order was clearly erroneous or contrary to law.

## III.   Analysis of Plaintiff's 56(d) Motion

### A.   Plaintiff's Reasons for the Rule 56(d) Motion

Plaintiff argues that Defendant's motion for summary judgment includes "new evidence," and that "[a]ll of Plaintiff's [discovery] requests are in response to new assertions made by the Defendants in their renewed motion for summary judgment . . . ." (ECF Nos. 133 at PageID

956; 138 at PageID 996.)  Plaintiff alleges that Defendant's motion raises three new issues.

First, Plaintiff claims that Mr. Moore's declaration implies that Defendants created a pork-free

diet for inmates with a religious objection to pork.  (ECF No. 133 at PageID 957.)  Second, Mr.

Moore's declaration allegedly raises a new claim that the Jail's accommodations for Muslim

inmates during the Ramadan Fast required extra staffing at the Jail's expense.  (*Id.*)  Plaintiff

also argues that Mr. Moore's declaration "implies that the Jail did not have the funding for the

Id Ul Fitr Feast of 2010."  (*Id.*)  And third, Plaintiff argues that Mr. Askew's declaration

suggests that the Jail kept records of the religious affiliations of its inmates.  (*Id.*)

Plaintiff attached an affidavit swearing that, without further discovery, he "cannot present

facts essential to justify [his] opposition to the pending motion for summary judgment."  (*Id.* at

PageID 979.)  And so Plaintiff tried to subpoena this information

1. The exact year Aramark began feeding a pork-free diet for everyone at the Jail;
2. A list of employees working for both the SCSO as Deputy Jailers and employees working for Aramark between Feb. 2010 – Feb. 2011;
3. The list of overtime hours worked over any months between Feb. 2010 – Feb. 2011; extra staffing expenses were incurred (if any) for any reason; and who those extra staff members were during that timeframe;
4. Records of jail expenses of feeding inmates in Intake during the hours of night-time arrests made between 8:00 p.m. and 5:00 a.m. between Feb. 2010 – Feb. 2011;
5. A copy of the Federal and State Funding for the SCSO accommodating the needs and requests of all inmates (religious needs);
6. A copy of the Jail's budget and expenditures for religious meals (Christmas meals, revival foods and beverages, etc.), religious decorations (Christmas decorations, ornaments, lightings, pictures) between the years Feb. 2010 – Feb. 2011;
7. The list of inmates who are Trustee workers in the Jail's kitchen, preparing the meals and feeding the entire Jail inmate population between Feb. 2010 – Feb. 2011 (the Annex Department has Pods where inmate Trustee workers are housed that work in the Jail's kitchen); and
8. Records of how many inmates were listed as Muslim and Christian (or other) at the Jail between Feb. 2010 – Feb. 2011.

(ECF No. 133 at PageID 963–64.)  His affidavit, however, does not explain why he cannot respond to Defendants' motion for summary judgment without this information.  (*See id.* at PageID 978–79.)

      **B.**    **Review of the Magistrate Court's Findings**

The Magistrate Court found that Plaintiff's motion to compel—which he filed after the discovery deadline—was untimely.  The Magistrate Court explained that "Rule 56(d) is intended to provide a mechanism for the parties and the court to give effect to the well-established principle that the plaintiff must receive a full opportunity to conduct discovery to be able to successfully defeat a motion for summary judgment." *Chubb Custom Ins. Co. v. Grange Mut. Cas. Co.*, No. 2:07-CV-1285, 2012 WL 1340369, at *2 (S.D. Ohio Apr. 17, 2012) (internal quotations omitted).  And, under Rule 56(d), "it is improper to grant summary judgment if [the party seeking Rule 56(d) relief] is given an insufficient opportunity for discovery." *Wilson v. Ebony Constr. LLC*, No 2:17-cv-1071, 2018 WL 4743063, at *3 (S.D. Ohio Oct. 2, 2018) (quoting *Dish Network LLC v. Fun Dish Inc.*, No. 1:08-CV-1540, 2011 WL 13130841, at *3 (N.D. Ohio Aug. 12, 2011)).

The Magistrate Court found that, here, "Pleasant-Bey has received a full opportunity to conduct discovery."  (ECF No. 136 at PageID 990.)  The deadline for completing discovery was October 24, 2014.  (*See* ECF No. 52.)  And so, "[t]he period for conducting discovery has long passed, and there is nothing in the record to suggest that Shelby County was unresponsive to discovery requests during that time."  (ECF No. 136 at PageID 990–91.)  For that reason, the Magistrate Court found that "Pleasant-Bey cannot now use Rule 56(d) to circumvent the deadlines of this court's scheduling order and seek broad requests of discovery from defendants."  (*Id.* at PageID 991.)

The Court finds that the Magistrate Court's decision was not clearly erroneous. Plaintiff's affidavit does not include any "specified reasons" that he "cannot present facts essential to justify" his opposition. *See* Fed. Rule Civ. P. 56(d). While he explains that Defendants presented new evidence, he does not explain why he cannot respond to Defendant's motion by affidavit or other evidence shared during discovery. (*See* ECF No. 133 at PageID 978–79.)

Plus, the *Doe* factors weigh against Plaintiff. Defendants did present new evidence with their motion—however, some of Plaintiff's discovery requests related to issues that he knew about during discovery, such as the Jail's budget. And the discovery period lasted at least five months (ECF No. 52 at PageID 480), and there is no evidence that either party "was dilatory" in its discovery efforts.[13] *See Doe*, 928 F.3d at 491. And most importantly, the Court finds that the desired discovery would not have changed its analysis of Defendants' motion for summary judgment. The Court therefore **DENIES** Plaintiff's Rule 56(d) motion. For the same reasons, the Court **DENIES** Plaintiff's motion to amend his response.

The Court does find, however, that more discovery is necessary before trial. This is because of the unique procedural history of this case and the new evidence attached by Defendants in their motion for summary judgment. The Court discusses both reasons in turn.

---

[13] After the Sixth Circuit remanded the district court's order on Defendants' first motion for summary judgment, the Court entered a new scheduling order that gave another five months of discovery. (*See* ECF Nos. 51 & 52.) The record does not show, however, the original scheduling order.

**C.      This Case's Unique Procedural History Warrants Limited Discovery**

This Case's procedural history is unique.  First, Plaintiff sued in 2011, and discovery

closed in 2014.  And yet, it is 2021 and, given the delay from the appeal, the parties still have

not tried this case.

Second, on appeal of this Court's order granting Defendants' motion for summary

judgment, the Sixth Circuit partially reversed and remanded the case because Defendants failed

to show that there were no genuine issues of material fact as to three of Plaintiff's claims.  (ECF

Nos. 105, 108 and 114 at PageID 888.)  Even Defendants acknowledge that the Sixth Circuit's

reversal "was based on its finding that the record evidence was lacking."  (ECF No. 129-1 at

PageID 912.)

On remand, Defendants again moved for summary judgment, and this time attached "the

clarifying evidence that the Sixth Circuit found to be absent."  (*Id.*)  This "clarifying evidence"

includes a Ramadan Diet sheet from Aramark and declarations from George Askew, Robert

Moore, Shirley Hayslett, and Julianna Croegaert.  (*Id.*; ECF Nos. 129-3, 129-4, 129-5, 129-6, &

129-7.)  So six years after the original discovery deadline ended, Defendants presented new

evidence in support of their summary judgment motion.  Even though the new evidence did not

eliminate the fact issues here, the Court finds it necessary to reopen discovery.

**D.      Defendants Present New Evidence with their Motion for Summary Judgment**

The Court reopens discovery because Defendants present new evidence with their motion

for summary judgment.  First, Defendants present new evidence about the Jail's Ramadan diet

and its accommodation of Muslim inmates.  In Mr. Moore's declaration, he states that "Muslim

inmates received certain accommodations at the Jail/County's expense."  (ECF No. 129-4 at

PageID 943.)  And as an example, he explains that "for a period of time," the Jail created "a

special pork-free diet" for Muslims and other inmates with religious objections to pork.  (*Id.*)

This differs from their position earlier.  For example, in their first motion for summary

judgment, Defendants argued that "no pork or pork based products are served in the Jail."  (ECF

Nos. 24 at PageID 189; 24-1 at PageID 196.)  Mr. Moore's declaration, however, says that the

Jail only had a pork-free diet "for a period of time."  (ECF No. 129-4 at PageID 943.)  Plaintiff

points out that it is unclear when this pork-free diet was in place.  (ECF No. 133 at PageID 959).

For that reason, Plaintiff seeks the time that Aramark began offering a pork-free diet at the Jail.

(*Id.* at PageID 957, 963.)

Defendants also attach for the first time a "Ramadan Religious Diet" sheet that describes

the meals served to inmates during Ramadan.  (ECF No. 129-6.)  The Court thus agrees that the

evidence in Defendants' latest motion for summary judgment raises new issues about the Jail's

Ramadan diet and when the Jail had a pork-free diet.

Next, Defendants' motion for summary judgment includes new claims about the Jail's

spending on religious accommodations during Ramadan.  In Mr. Moore's declaration, he states

that the Jail accommodated Muslim inmates during Ramadan, and that these accommodations

required "overtime, extra staffing, and other administrative efforts to carry out."  (ECF No. 129-

4 at PageID 943.)  This is the first time Defendants argue that they hired extra staff and paid

workers overtime to accommodate Muslim inmates during Ramadan.  So Plaintiff first learned

of this issue when Defendants moved for summary judgment a few months ago.  Because

Defendants never claimed that they spent extra resources on Ramadan before 2014, Plaintiff had

no reason to seek that evidence.

And finally, Defendants attach new evidence that the Jail recorded the religious

affiliations of its inmates.  First, Mr. Askew's affidavit says that "[t]he majority of the detainees

in the Jail who expressed a religious preference identified as Christian." (ECF No. 129-3 at PageID 938.) He also references the small number of Muslim inmates, saying that "there were not enough Muslim detainees in the Jail to constitute an entire Pod." (*Id.*) And second, Mr. Moore's declaration says that, on average, fewer than 100 inmates at the Jail identified as Muslims. (ECF No. 129-4 at PageID 942.) Plaintiff, therefore, requests records of how many inmates identified as Muslim and Christian at the Jail during the relevant time. (ECF No. 133 at PageID 959, 963–64.)

In their first motion for summary judgment, Defendants claimed that the Jail houses about 2,600 pretrial inmates daily. (ECF No. 24-1 at PageID 196.) But Defendants did not say that they recorded the number of Muslim or Christian inmates. The Court finds that the specific number of Muslim inmates at the Jail is relevant to whether the Jail had a legitimate penological reason for restricting Muslim services. And, it may be relevant to Defendants' new arguments that it expended additional Jail resources on the Ramadan fast. (*See* ECF No. 129-4 at PageID 943.)

In the end, although discovery originally closed in 2014, Defendants now present new evidence with their motion for summary judgment. The Court therefore finds that limited pretrial discovery is appropriate here. And under Federal Rule of Civil Procedure 16(b), the Court can modify a scheduling order for good cause. Fed. R. Civ. P. 16(b)(4); *see also Morgan v. Gandalf, Ltd.*, 165 F. App'x 425, 430 (6th Cir. 2006). For the above reasons, the Court finds that there is good cause to reopen discovery here. The Court will set a scheduling conference to determine the new discovery deadlines in the coming days.

<u>**CONCLUSION**</u>

The Court therefore **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.  It **GRANTS** the motion as to Plaintiff's claims about GIU officers monitoring services.  But it **DENIES** the motion as to his other claims.  Also, the Court **DENIES** the Individual Defendants' motion for summary judgment because of qualified immunity.

The Court also **DENIES** Plaintiff's objections to the Magistrate Court's order and **DENIES** his motion to amend.  The Court does, however, **AMEND** the scheduling order to allow for limited discovery before trial.

**SO ORDERED**, this 1st day of February, 2021.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE